**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ALBERT DOWDELL, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br>v.<br><br>CLINICAL REGISTRY SOLUTIONS,<br><br>Defendant. | Case No. ____________<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff Albert Dowdell ("Plaintiff"), individually and on behalf of all others similarly situated, brings this action against Defendant Clinical Registry Solutions ("CRS" or "Defendant") to obtain damages, restitution, and injunctive relief from Defendant. Plaintiff makes the following allegations upon information and belief, except as to his own actions, the investigation of his counsel, and facts that are a matter of public record.

## NATURE OF THE ACTION

1. This class action arises out of Defendant CRS's failures to properly secure, safeguard, encrypt, and/or timely and adequately destroy Plaintiff's and Class Members' sensitive personal identifiable information that it had acquired and stored for its business purposes. This failure to secure and monitor its network resulted in a May 2026 data breach ("Data Breach") of highly sensitive documents and information stored on the computer network of CRS, a clinician-led organization that provides clinical registry abstraction and healthcare data management services for hospitals across the United States and Canada.

2. Defendant's data security failures allowed a targeted cyberattack in or about May 2026 to compromise Defendant's network (the "Data Breach") that contained personally identifiable information ("PII") and protected health information ("PHI") (collectively, "the Private Information") of Plaintiff and other individuals ("the Class").

3. Upon information and belief, on or about May 6, 2026, the threat actor "Akira" successfully breached CRS's inadequately protected computer systems and accessed and exfiltrated approximately 41 gigabytes of highly sensitive data, including patient registry data, employee personal information, and other corporate records. The incident was publicly reported by DeXpose and other cybersecurity intelligence sources.[1] As of the filing of this Complaint, Defendant has not provided adequate notice to all affected individuals.

4. Akira ransomware is a particularly aggressive ransomware variant first identified in early 2023, which attacks both Windows and Linux systems and uses ChaCha2008 encryption to deny users access to their data. The group is known for gaining initial access through phishing emails and the exploitation of vulnerabilities in VPN endpoints. The group is known for demanding extraordinarily large ransoms and, in some cases, performing extortion-only attacks that skip encryption entirely and instead exfiltrate data with a demand for payment to prevent public leakage.[2]

5. Per the threat actor's public statement, the data Akira claims to have exfiltrated from CRS includes, but is not limited to: detailed employee personal information (passports, driver's licenses, Social Security numbers, and health information), client documents and personal

---

[1] DeXpose, *Akira Ransomware Attack Strikes Clinical Registry Solutions*, https://www.dexpose.io/akira-ransomware-attack-strikes-clinical-registry-solutions/ (last visited May 15, 2026).

[2] Check Point Software, *Akira Ransomware*, https://www.checkpoint.com/cyber-hub/threat-prevention/ransomware/akira-ransomware/ (last visited May 15, 2026).

information, financial records, payment details, contracts, agreements, and non-disclosure agreements.[3]

6. The information collected and maintained by CRS, in connection with its provision of registry abstraction and data management services to hospitals across the United States and Canada, included sensitive personal and protected health information of patients (including Plaintiff) and current and former employees. This Private Information, stored on Defendant's computer network, included, but was not limited to: names, addresses, dates of birth, email addresses, telephone numbers, Social Security numbers (of employees and certain patients), driver's license and passport numbers, health insurance information, medical treatment information, medical diagnoses, medications, lab results, and other clinical registry data.

7. Upon information and belief, the cybercriminals intentionally targeted CRS for the highly sensitive Private Information it stores on its computer network, attacked the insufficiently secured network, then exfiltrated highly sensitive PII and PHI. As a result, the Private Information of Plaintiff and the Class remains in the hands of cyber-criminals.

8. The Data Breach was a direct result of Defendant's failure to implement adequate and reasonable cybersecurity procedures and protocols necessary to protect individuals' Private Information with which it was entrusted in connection with its work as a healthcare business associate.

9. Plaintiff brings this class action lawsuit on behalf of himself and all others similarly situated to address Defendant's inadequate safeguarding of Class Members' Private Information that it collected and maintained, and for failing to provide timely and adequate notice to Plaintiff

[3] https://www.dexpose.io/akira-ransomware-attack-strikes-clinical-registry-solutions/ (last visited May 15, 2026).

and other Class Members that their information had been subject to the unauthorized access of an unknown third party, including in that notice precisely what specific types of information were accessed and taken by cybercriminals.

10. Defendant maintained the Private Information in a reckless manner. In particular, the Private Information was maintained on Defendant CRS's computer network in a condition vulnerable to cyberattacks. Upon information and belief, the mechanism of the Data Breach and potential for improper disclosure of Plaintiff's and Class Members' Private Information was a known risk to Defendant, and thus Defendant was on notice that failing to take steps necessary to secure the Private Information from those risks left that property in a dangerous condition.

11. Defendant disregarded the rights of Plaintiff and Class Members (defined below) by, *inter alia*, intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure its data systems were protected against unauthorized intrusions; failing to disclose that it did not have adequately robust computer systems and security practices to safeguard Plaintiff's and Class Members' Private Information; failing to take standard and reasonably available steps to prevent the Data Breach; and failing to provide Plaintiff and Class Members with prompt and full notice of the Data Breach.

12. In addition, Defendant CRS failed to properly monitor the computer network and systems that housed the Private Information. Had CRS properly monitored its property, it would have discovered the intrusion sooner rather than allowing cybercriminals unimpeded access to the PII and PHI of Plaintiff and Class Members.

13. Plaintiff's and Class Members' identities are now at risk because of Defendant's negligent conduct since the Private Information that Defendant CRS collected and maintained is now in the hands of data thieves.

14. Armed with the Private Information accessed in the Data Breach, data thieves can commit a variety of crimes including, *e.g.*, opening new financial accounts in Class Members' names, taking out loans in Class Members' names, using Class Members' information to obtain government benefits, filing fraudulent tax returns using Class Members' information, filing false medical claims using Class Members' information, obtaining driver's licenses in Class Members' names but with another person's photograph, and giving false information to police during an arrest.

15. As a result of the Data Breach, Plaintiff and Class Members have been exposed to a heightened and imminent risk of fraud and identity theft. Plaintiff has already experienced a marked uptick in unsolicited spam telephone calls, text messages, and other contact attempts since the Data Breach, which Plaintiff did not experience at the same volume prior to the Data Breach. Plaintiff and Class Members must now and for years into the future closely monitor their financial accounts to guard against identity theft.

16. Plaintiff and Class Members may also incur out-of-pocket costs for, *e.g.*, purchasing credit monitoring services, credit freezes, credit reports, or other protective measures to deter and detect identity theft.

17. Through this Complaint, Plaintiff seeks to remedy these harms on behalf of himself and all similarly situated individuals whose Private Information was accessed during the Data Breach (the "Class").

18. Accordingly, Plaintiff brings this action against Defendant seeking redress for its unlawful conduct, and asserting claims for: (i) negligence; (ii) negligence *per se*; (iii) breach of implied contract; (iv) breach of fiduciary duty; (v) unjust enrichment; and (vi) declaratory relief.

19. Plaintiff seeks remedies, including, but not limited to, compensatory damages, reimbursement of out-of-pocket costs, and injunctive relief, including improvements to Defendant's data security systems, future annual audits, as well as long-term and adequate credit monitoring services funded by Defendant, and declaratory relief.

## PARTIES

20. Plaintiff Albert Dowdell is, and at all times mentioned herein was, an individual citizen of the State of Illinois, residing in the village of Oak Lawn, Illinois. Plaintiff is an individual who utilized CRS for its services, and who entrusted CRS (directly or indirectly) with his sensitive Private Information.

21. Defendant Clinical Registry Solutions is a healthcare data management and clinical registry abstraction company with its principal place of business at 306 Gold Street, 31E, Brooklyn, New York 11201. Defendant operates nationally and provides registry abstraction, auditing, accreditation support, mock surveys, training, and analytics services to hospitals and healthcare organizations across the United States and Canada.[4]

## JURISDICTION AND VENUE

22. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs; there are more than 100 members in the proposed class; and at least one member of the class (including Plaintiff) is a citizen of a state different from Defendant.

---

[4] Clinical Registry Solutions, *About Us*, https://clinicalregistrysolutions.com/about-us/ (last visited May 15, 2026).

23. The Court has general personal jurisdiction over Defendant because, personally or through its agents, Defendant operates, conducts, engages in, or carries on a business or business venture in this State; it maintains its principal place of business in Brooklyn, New York; and it committed tortious acts in this District.

24. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because it is the district within which CRS is headquartered and has its most significant contacts, and because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## FACTUAL ALLEGATIONS

### *Defendant's Business*

25. Defendant CRS describes itself as a "clinician-led national organization supporting hospitals across the U.S. and Canada with multi-specialty registry services." Its stated mission is to "empower healthcare teams by streamlining multi-specialty registry data management" through "expert abstraction, auditing, accreditation support, mock surveys, training, and analytics."[5]

26. CRS began as Cardiac Registry Support in 2008 and has since expanded into a nationwide partner for registry abstraction across numerous specialties. CRS reports that it supports over 25 different clinical registries across multiple specialties, employs more than 100 clinical professionals, and serves healthcare facilities across the United States and Canada.[6]

27. CRS supports a broad range of major clinical registries, including the American College of Cardiology's NCDR Registries, Cancer Registry Support, Core Measures Abstraction Services, the Get With The Guidelines (GWTG) Registry, the Metabolic and Bariatric Surgery Accreditation and Quality Improvement Program (MBSAQIP), the National Surgical Quality

---

[5] Clinical Registry Solutions, *About Us*, https://clinicalregistrysolutions.com/about-us/ (last visited May 15, 2026).

[6] *Id.*

Improvement Program (NSQIP), the Pediatric Cardiac Critical Care Consortium (PC4), and the Society of Thoracic Surgeons (STS) Adult Cardiac Surgery Database, among others.[7]

28. In the ordinary course of providing third-party clinical registry abstraction and data management services to its hospital clients, each patient (directly or indirectly) (and each employee provides (and Plaintiff did provide) CRS with sensitive, personal, and private information, such as their:

- Name, address, phone number, and email address;
- Date of birth;
- Social Security number (in the case of employees and certain registry data);
- Demographic information;
- Driver's license, passport, or other state or federal identification;
- Information relating to the individual's medical history;
- Diagnoses, treatments, procedures, medications, and lab results;
- Insurance information and coverage; and
- Other clinical registry data abstracted from the patient's medical record.

29. Defendant also creates and stores medical records and other protected health information for the patients whose data it abstracts and manages, including records of treatments and diagnoses.

30. Upon information and belief, Defendant CRS, acting as a business associate to various medical providers, is responsible for administering registry abstraction services that require the receipt, storage, and handling of patients' Protected Health Information ("PHI"). Pursuant to the Health Insurance Portability and Accountability Act ("HIPAA"), 45 C.F.R. §§ 160

[7] Clinical Registry Solutions, https://clinicalregistrysolutions.com/ (last visited May 15, 2026).

and 164, CRS is required to adopt and maintain adequate privacy and security practices to protect patient PHI.

31. Defendant CRS had a legal duty to ensure that PHI provided by Plaintiff and Class Members was maintained in a secure, confidential manner and in compliance with HIPAA, the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45, and other applicable laws. Through its business associate agreements with covered entities, Defendant CRS also undertook contractual obligations to safeguard PHI and follow HIPAA-required procedures.

32. Despite these obligations, as alleged herein, Defendant failed to implement appropriate administrative, technical, and physical safeguards to adequately protect PHI, causing Plaintiff's and Class Members' sensitive medical and personal information to be exposed.

33. The Private Information at issue includes, but is not limited to, Plaintiff's and Class Members' names, addresses, dates of birth, medical records, clinical registry data, insurance information, and — for employees and certain other affected individuals — Social Security numbers, driver's license numbers, and passport numbers. By failing to properly secure this information, CRS violated HIPAA, reneged on its legal obligations, and failed to meet the assurances inherent in its role as a business associate entrusted with the PHI of thousands of patients.

***The Data Breach***

34. A data breach occurs when cyber criminals intend to access and steal Private Information that has not been adequately secured by a business entity like CRS.

35. Upon information and belief, Defendant experienced a cyber-attack on its computer systems by the Akira ransomware group on or about May 6, 2026, when the threat actor claimed

responsibility for the attack and threatened to publicly leak 41 gigabytes of data exfiltrated from CRS's computer systems.[8]

36. As reported on Akira's dark-web leak site, the threat actor stated: "We will upload 41gb of corporate data soon. Detailed employee personal information (passports, DLs, SSNs, health information, and other docs), client documents and personal information, financials, payment details, contracts and agreements, NDAs, and so on."[9]

37. As of the filing of this Complaint, Defendant has not publicly confirmed the full scope of the Data Breach, has not notified the U.S. Department of Health and Human Services' Office for Civil Rights of the Data Breach to the extent required by HIPAA, and — upon information and belief — has not provided complete, accurate, and timely written notice to all affected patients and employees identifying the specific categories of their Private Information that were accessed and exfiltrated.

38. Since the Data Breach, according to cybersecurity news sources, the Akira ransomware group has publicly claimed responsibility for the attack and threatened to leak the stolen files.

39. The healthcare industry has long been recognized as a high-value target for ransomware groups. HHS and other federal agencies have repeatedly warned healthcare entities and their business associates of the severe threats posed by groups like Akira, Royal, BlackCat, and similar cybercriminal organizations. Within the healthcare industry, the risk of a cyber attack is well-known and preventable with adequate security systems in place.

---

[8] https://www.dexpose.io/akira-ransomware-attack-strikes-clinical-registry-solutions/ (last accessed May 18, 2026).

[9] *Id.*

40. CRS's data security obligations were particularly important given the substantial increase in cyberattacks against healthcare entities and business associates in recent years.

41. CRS knew or should have known that its electronic records — which include clinical registry data abstracted from hospital electronic health records — would be targeted by cybercriminals.

42. CRS had obligations created by HIPAA, the FTCA, contract, industry standards, common law, state law, and representations made to Plaintiff and Class Members to keep their Private Information confidential and to protect it from unauthorized access and disclosure.

43. Plaintiff and Class Members provided their Private Information (directly or indirectly through their healthcare providers) to Defendant with the reasonable expectation and mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access.

***The Data Breach was a Foreseeable Risk of which Defendant was on Notice***

44. It is well known that PII and PHI, including Social Security numbers and detailed clinical data, are valuable commodities and frequent, intentional targets of cyber criminals. Companies that collect such information, including CRS, are well aware of the risk of being targeted by cybercriminals.

45. Individuals place a high value not only on their PII and PHI, but also on the privacy of that data. Identity theft causes severe negative consequences to its victims, including direct financial losses and severe distress, as well as hours of lost time trying to fight against the impact of identity theft.

46. A data breach increases the risk of becoming a victim of identity theft. Victims of identity theft can suffer from both direct and indirect financial losses. According to a research

study published by the Department of Justice, "[a] direct financial loss is the monetary amount the offender obtained from misusing the victim's account or personal information, including the estimated value of goods, services, or cash obtained. It includes both out-of-pocket loss and any losses that were reimbursed to the victim. An indirect loss includes any other monetary cost caused by the identity theft, such as legal fees, bounced checks, and other miscellaneous expenses that are not reimbursed (e.g., postage, phone calls, or notary fees)."[10]

47. Individuals, like Plaintiff and Class Members, are particularly concerned with protecting the privacy of their personal identifiers, including Social Security numbers, government identification numbers, and detailed medical histories — all of which can be used by identity thieves to commit financial and medical identity theft.

48. Data breach victims suffer long-term consequences when their personal identifiers are taken and used by hackers. Even if they know their information is being misused, victims often cannot obtain new identifiers (such as Social Security numbers) without significant difficulty and evidence of actual misuse.

49. The Social Security Administration has warned that "a new [Social Security] number probably won't solve all your problems. This is because other government agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) will have records under your old number . . . . So, using a new number won't guarantee you a fresh start."[11]

---

[10] *Victims of Identity Theft, 2018*, U.S. Department of Justice (April 2021, NCJ 256085), https://bjs.ojp.gov/content/pub/pdf/vit18.pdf (last accessed May 15, 2026).

[11] Social Security Administration, *Identity Theft and Your Social Security Number*, https://www.ssa.gov/pubs/EN-05-10064.pdf (last accessed May 15, 2026).

50. In 2024, healthcare data breaches reached an all-time high, with more than 276 million records compromised — a 64.1% increase from the previous year's record and equivalent to approximately 81% of the United States population.[12] Ransomware remains the top predicted threat to the healthcare sector for 2025 and 2026, and nation-state and criminal actors continue to grow more sophisticated, particularly as artificial intelligence is increasingly leveraged in cyberattacks.[13]

51. Cyberattacks have become so notorious that the FBI and U.S. Secret Service have issued repeated warnings to potential targets so they are aware of, and prepared for, and hopefully can ward off a cyberattack.

52. According to an FBI publication, "[r]ansomware is a type of malicious software, or malware, that prevents you from accessing your computer files, systems, or networks and demands you pay a ransom for their return. Ransomware attacks can cause costly disruptions to operations and the loss of critical information and data."[14] The FBI does not support paying a ransom in response to a ransomware attack, as paying a ransom does not guarantee that an organization will get any data back, and it encourages perpetrators to target more victims.[15]

53. Despite the prevalence of public announcements of data breaches and data security compromises, and despite its own acknowledgments of its duties to keep PII and PHI private and

---

[12] *See* HIPAA Journal, *Biggest Healthcare Data Breaches*, https://www.hipaajournal.com/biggest-healthcare-data-breaches-2024/ (last accessed May 15, 2026).

[13] *See* Chuck Brooks, *Key Cybersecurity Challenges In 2025: Trends And Observations*, Forbes (Apr. 5, 2025), https://www.forbes.com/sites/chuckbrooks/2025/04/05/key-cybersecurity-challenges-in-2025-trends-and-observations/ (last accessed May 15, 2026).

[14] FBI, *Ransomware*, https://www.fbi.gov/how-we-can-help-you/safety-resources/scams-and-safety/common-scams-and-crimes/ransomware (last accessed May 15, 2026).

[15] *Id.*

secure, CRS failed to take appropriate steps to protect the Private Information of Plaintiff and the proposed Class from being compromised.

***Data Breaches are Rampant in Healthcare***

54. Defendant's data security obligations were particularly important given the substantial increase in data breaches in the healthcare industry preceding the date of the breach.

55. According to an article in the HIPAA Journal, cybercriminals hack into healthcare entities and their business associates for their "highly prized" medical records. The number of data breaches reported by HIPAA-regulated entities continues to increase every year, and almost three-quarters of those breaches are classified as hacking/IT incidents.[16]

56. Healthcare organizations and their business associates are easy targets because "even relatively small healthcare providers may store the records of hundreds of thousands of patients. The stored data is highly detailed, including demographic data, Social Security numbers, financial information, health insurance information, and medical and clinical data, and that information can be easily monetized."[17]

57. The HIPAA Journal article goes on to explain that patient records, like those stolen from CRS, are "often processed and packaged with other illegally obtained data to create full record sets (fullz) that contain extensive information on individuals, often in intimate detail." The record sets are then sold on dark-web sites to other criminals and "allow an identity kit to be created, which can then be sold for considerable profit to identity thieves or other criminals to support an extensive range of criminal activities."[18]

---

[16] HIPAA Journal, *Why Do Criminals Target Medical Records?*, https://www.hipaajournal.com/why-do-criminals-target-medical-records/ (last accessed May 15, 2026).

[17] *Id.*

[18] *Id.*

58. Data breaches such as the one experienced by Defendant CRS have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued warnings to potential targets so they are aware of, can prepare for, and hopefully can ward off a potential attack.

59. According to the cybersecurity firm Mimecast, 90% of healthcare organizations have experienced cyberattacks in recent years.[19]

60. HHS data shows that tens of millions of patients' information has been exposed in healthcare breaches in recent years, with the number of breaches doubling within just a few years.[20]

61. According to Advent Health University, when an electronic health record "lands in the hands of nefarious persons the results can range from fraud to identity theft to extortion. In fact, these records provide such valuable information that hackers can sell a single stolen medical record for up to $1,000."[21]

62. The significant increase in attacks in the healthcare industry, and attendant risk of future attacks, is widely known to the public and to anyone in that industry, including Defendant CRS.

***Defendant Fails to Comply with FTC Guidelines***

63. The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices.

---

[19] *See* Maria Henriquez, *Iowa City Hospital Suffers Phishing Attack*, Security Magazine (Nov. 23, 2020), https://www.securitymagazine.com/articles/93988-iowa-city-hospital-suffers-phishing-attack (last accessed May 15, 2026).

[20] Health IT Security, *Biggest Healthcare Data Breaches Reported This Year So Far*, https://healthitsecurity.com/features/biggest-healthcare-data-breaches-reported-this-year-so-far (last accessed May 15, 2026).

[21] Advent Health University, *Data Security in Healthcare*, https://www.ahu.edu/blog/data-security-in-healthcare (last accessed May 15, 2026).

According to the FTC, the need for data security should be factored into all business decision-making.

64. In October 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[22] The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[23]

65. The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

66. The FTC has brought enforcement actions against businesses, like CRS, for failing to adequately and reasonably protect patient data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act, 15 U.S.C. §

---

[22] Federal Trade Commission, *Protecting Personal Information: A Guide for Business* (2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last accessed May 15, 2026).

[23] *Id.*

45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

67. These FTC enforcement actions include actions against healthcare-related businesses like Defendant. *See, e.g., In the Matter of LabMD, Inc., A Corp.*, 2016-2 Trade Cas. (CCH) ¶ 79708, 2016 WL 4128215, at *32 (MSNET July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.").

68. Defendant failed to properly implement basic data security practices.

69. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to patients' PII and PHI constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

70. Defendant was at all times fully aware of its obligation to protect the PII and PHI of patients and employees. Defendant was also aware of the significant repercussions that would result from its failure to do so.

***Defendant Fails to Comply with Industry Standards***

71. As shown above, experts studying cybersecurity routinely identify healthcare-related entities and their business associates as being particularly vulnerable to cyberattacks because of the value of the PII and PHI that they collect and maintain.

72. Several best practices have been identified that at a minimum should be implemented by healthcare-related entities like Defendant, including but not limited to: educating all employees; utilizing strong passwords; creating multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; using multi-

factor authentication; protecting backup data; and limiting which employees can access sensitive data.

73. Other best cybersecurity practices that are standard in the healthcare industry include installing appropriate malware detection software; monitoring and limiting network ports; protecting web browsers and email management systems; configuring network systems such as firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system vulnerabilities; and training staff regarding critical points.

74. Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are established standards in reasonable cybersecurity readiness.

75. These frameworks are existing and applicable industry standards in the healthcare industry, yet Defendant failed to comply with these accepted standards, thereby opening the door to and failing to thwart the Data Breach.

***Defendant's Conduct Violates HIPAA***

76. HIPAA requires covered entities and their business associates such as Defendant to protect against reasonably anticipated threats to the security of sensitive patient health information (PHI).

77. Covered entities and business associates must implement safeguards to ensure the confidentiality, integrity, and availability of PHI. Safeguards must include physical, technical, and administrative components.

78. Title II of HIPAA contains what are known as the Administrative Simplification provisions. 42 U.S.C. §§ 1301, *et seq*. These provisions require, among other things, that the Department of Health and Human Services ("HHS") create rules to streamline the standards for handling PII like the data Defendant left unguarded. HHS subsequently promulgated multiple regulations under authority of the Administrative Simplification provisions of HIPAA. These rules include 45 C.F.R. § 164.306(a)(1)–(4); 45 C.F.R. § 164.312(a)(1); 45 C.F.R. § 164.308(a)(1)(i); 45 C.F.R. § 164.308(a)(1)(ii)(D); and 45 C.F.R. § 164.530(b).

79. A data breach such as the one Defendant experienced is considered a breach under the HIPAA rules because there is an access of PHI not permitted under the HIPAA Privacy Rule. A breach under the HIPAA Rules is defined as ". . . the acquisition, access, use, or disclosure of PHI in a manner not permitted under the [HIPAA Privacy Rule] which compromises the security or privacy of the PHI." *See* 45 C.F.R. § 164.402.

80. Defendant's Data Breach resulted from a combination of insufficiencies that demonstrate it failed to comply with safeguards mandated by HIPAA regulations.

***Defendant has Breached its Obligations to Plaintiff and Class***

81. Defendant breached its obligations to Plaintiff and Class Members and/or was otherwise negligent and reckless because it failed to properly maintain and safeguard its computer systems and its patients' data. Defendant's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

- Failing to maintain an adequate data security system to reduce the risk of data breaches and cyber-attacks;
- Failing to adequately protect patients' and employees' Private Information;
- Failing to properly monitor its own data security systems for existing intrusions;
- Failing to ensure that vendors with access to Defendant's protected health data employed reasonable security procedures;
- Failing to ensure the confidentiality and integrity of electronic PHI it created, received, maintained, and/or transmitted, in violation of 45 C.F.R. § 164.306(a)(1);
- Failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights, in violation of 45 C.F.R. § 164.312(a)(1);
- Failing to implement policies and procedures to prevent, detect, contain, and correct security violations, in violation of 45 C.F.R. § 164.308(a)(1)(i);
- Failing to implement procedures to review records of information system activity regularly, such as audit logs, access reports, and security incident tracking reports, in violation of 45 C.F.R. § 164.308(a)(1)(ii)(D);
- Failing to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI, in violation of 45 C.F.R. § 164.306(a)(2);
- Failing to protect against reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information, in violation of 45 C.F.R. § 164.306(a)(3);

- Failing to ensure compliance with HIPAA security standard rules by Defendant's workforce, in violation of 45 C.F.R. § 164.306(a)(4);
- Failing to train all members of Defendant's workforce effectively on the policies and procedures regarding PHI as necessary and appropriate for the members of their workforces to carry out their functions and to maintain security of PHI, in violation of 45 C.F.R. § 164.530(b); and/or
- Failing to render the electronic PHI it maintained unusable, unreadable, or indecipherable to unauthorized individuals, as it had not encrypted the electronic PHI as specified in the HIPAA Security Rule.

82. As the result of maintaining its computer systems in a manner that required security upgrading, inadequate procedures for handling emails containing ransomware or other malignant computer code, and inadequately trained employees, Defendant negligently and unlawfully failed to safeguard Plaintiff's and Class Members' Private Information.

83. Accordingly, as outlined below, Plaintiff and Class Members now face an increased risk of fraud and identity theft.

***Data Breaches Put Consumers at an Increased Risk of Fraud and Identity Theft***

84. Data breaches such as the one experienced by Plaintiff and the Class are especially problematic because of the disruption they cause to the daily lives of victims affected by the attack.

85. In 2019, the United States Government Accountability Office released a report addressing the steps consumers can take after a data breach.[24] Its appendix of steps consumers should consider, in extremely simplified terms, continues for five pages. In addition to explaining

[24] U.S. Government Accountability Office, https://www.gao.gov/assets/gao-19-230.pdf (last accessed May 15, 2026). *See* attached as Ex. A.

specific options and how they can help, one column of the chart explains the limitations of the consumers' options. *See* GAO chart of consumer recommendations, reproduced and attached as Exhibit A. It is clear from the GAO's recommendations that the steps Data Breach victims (like Plaintiff and the Class) must take after a breach like Defendant's are both time consuming and of only limited and short-term effectiveness.

86. The GAO has long recognized that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record," discussing the same in a 2007 report as well ("2007 GAO Report").[25]

87. The FTC, like the GAO, recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (and considering an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[26]

88. Identity thieves use stolen personal information — including Social Security numbers, driver's license numbers, passport numbers, and medical information — for a variety of crimes, including credit card fraud, phone or utilities fraud, bank/finance fraud, and medical identity theft.

---

[25] *See Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, U.S. Government Accountability Office, June 2007, https://www.gao.gov/new.items/d07737.pdf (last accessed May 15, 2026).

[26] *See* https://www.identitytheft.gov/Steps (last accessed May 15, 2026).

89. Identity thieves can also use stolen identifiers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; to obtain government benefits in a victim's name; or to file a fraudulent tax return using a victim's information.

90. Theft of Private Information is also gravely serious. PII and PHI are valuable property rights.[27]

91. It must also be noted there may be a substantial time lag — measured in years — between when harm occurs versus when it is discovered, and also between when Private Information and/or financial information is stolen and when it is used. According to the U.S. Government Accountability Office: "[L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years." *See* 2007 GAO Report, at p. 29.

92. Private Information and financial information are such valuable commodities to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for years.

93. There is a strong probability that the entirety of the stolen information has been dumped on the black market or will be dumped on the black market, meaning Plaintiff and Class Members are at an increased risk of fraud and identity theft for many years into the future. Thus, Plaintiff and Class Members must vigilantly monitor their financial and medical accounts for many years to come.

[27] *See, e.g.*, John T. Soma, et al., *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets*, 15 Rich. J.L. & Tech. 11, at *3-4 (2009).

94. As HHS warns, "PHI can be exceptionally valuable when stolen and sold on a black market, as it often is. PHI, once acquired by an unauthorized individual, can be exploited via extortion, fraud, identity theft and data laundering. At least one study has identified the value of a PHI record at $1000 each."[28]

95. In recent years, the medical and financial services industries have experienced disproportionally higher numbers of data theft events than other industries. Defendant therefore knew or should have known this and strengthened its data systems accordingly. Defendant was put on notice of the substantial and foreseeable risk of harm from a data breach, yet it failed to properly prepare for that risk.

## PLAINTIFF'S EXPERIENCES

***Plaintiff Albert Dowdell***

96. Plaintiff Albert Dowdell is, and at all times mentioned herein was, an individual citizen residing in the State of Illinois, in the village of Oak Lawn.

97. Plaintiff Dowdell is an individual who utilized services provided by CRS. Plaintiff entrusted CRS with highly sensitive Private Information, including but not limited to: his full name, date of birth, contact information, insurance information, Social Security Number, and protected health information (including medical history, diagnoses, treatments, and related clinical data). Upon information and belief, Plaintiff's Private Information was maintained on CRS's computer systems on or before May 6, 2026, when those systems were subject to unauthorized access and exfiltration by the Akira ransomware group. Plaintiff's Private Information, therefore, was among the data compromised in the incident.

---

[28] U.S. Department of Health and Human Services, *Cost Analysis of Healthcare Sector Data Breaches*, https://www.hhs.gov/sites/default/files/cost-analysis-of-healthcare-sector-data-breaches.pdf (last accessed May 15, 2026).

98. Following the Data Breach, Plaintiff became aware of the incident through publicly available reporting and his own online research.

99. Since the Data Breach, Plaintiff has experienced a significant and noticeable uptick in unsolicited spam telephone calls, text messages, and other unwanted contacts. The volume and frequency of such contacts has materially increased compared to the period before the Data Breach. Plaintiff reasonably attributes this uptick to the Data Breach and to the exposure of his contact information to cyber-criminals as a result of Defendant's failure to adequately safeguard his Private Information.

100. Since learning of the Data Breach, Plaintiff has devoted, and continues to devote, approximately one hour each week to monitoring his financial accounts and records for signs of fraudulent activity. This is time Plaintiff would not otherwise have spent but for the Data Breach. Having to do this every week not only wastes Plaintiff's time as a result of CRS's negligence, but also causes him anxiety and concern about the continued misuse of his Private Information.

101. Plaintiff Dowdell is aware that cybercriminals often sell Private Information, and once stolen, such information is likely to be abused for months or even years after the Data Breach.

102. Had Plaintiff Dowdell been aware that CRS's computer systems were not secure, he would not have entrusted CRS (directly or through his healthcare providers) with his PII and PHI.

## **PLAINTIFF AND CLASS MEMBERS' INJURIES**

103. To date, Defendant CRS has done little or nothing to compensate Plaintiff and Class Members for the damages they sustained in the Data Breach.

104. To the extent Defendant CRS has offered credit monitoring services, any such offer is inadequate when victims are likely to face many years of risk of identity theft.

105. Defendant's response fails to sufficiently compensate victims of the Data Breach, who commonly face multiple years of ongoing identity theft risk, and it entirely fails to provide adequate compensation for the unauthorized release and disclosure of Plaintiff's and Class Members' Private Information, the out-of-pocket costs they have incurred and will incur, and the time they are required to spend attempting to mitigate their injuries.

106. Plaintiff and Class Members have been damaged by the compromise and exfiltration of their Private Information in the Data Breach, and by the severe disruption to their lives as a direct and foreseeable consequence of this Data Breach.

107. Plaintiff's and Class Members' Private Information was compromised and exfiltrated by cyber-criminals as a direct and proximate result of the Data Breach.

108. Plaintiff and the Class were damaged in that their Private Information is now in the hands of cyber criminals, sold or potentially for sale for years into the future.

109. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have been placed at an actual, imminent, and substantial risk of harm from fraud and identity theft. Plaintiff has already experienced a noticeable uptick in spam communications attributable to the Data Breach.

110. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have been forced to expend time dealing with the effects of the Data Breach, including approximately one hour per week of additional account monitoring by Plaintiff.

111. Plaintiff and Class Members face substantial risk of out-of-pocket fraud losses such as loans opened in their names, medical services billed in their names, tax return fraud, utility bills opened in their names, credit card fraud, and similar identity theft. Plaintiff and Class Members

may also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

112. Plaintiff and Class Members face substantial risk of being targeted for future phishing, data intrusion, and other illegal schemes based on their Private Information, as potential fraudsters could use that information to more effectively target such schemes to Plaintiff and Class Members. Plaintiff's observed increase in spam and unsolicited contacts is direct evidence of this risk having begun to materialize.

113. Plaintiff and Class Members also suffered a loss of value of their Private Information when it was acquired by cyber thieves in the Data Breach. Numerous courts have recognized the propriety of loss of value damages in related cases.

114. Plaintiff and Class Members have spent and will continue to spend significant amounts of time to monitor their financial accounts and records for misuse.

115. Plaintiff and Class Members have suffered or will suffer actual injury as a direct result of the Data Breach. Many victims have suffered or will suffer ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach relating to:

- Finding fraudulent charges;
- Canceling and reissuing credit and debit cards;
- Purchasing credit monitoring and identity theft prevention;
- Monitoring their medical records for fraudulent charges and data;
- Addressing their inability to withdraw funds linked to compromised accounts;
- Taking trips to banks and waiting in line to obtain funds held in limited accounts;
- Placing "freezes" and "alerts" with credit reporting agencies;

- Spending time on the phone with or at a financial institution to dispute fraudulent charges;
- Contacting financial institutions and closing or modifying financial accounts;
- Resetting automatic billing and payment instructions from compromised credit and debit cards to new ones;
- Paying late fees and declined payment fees imposed as a result of failed automatic payments that were tied to compromised cards that had to be cancelled;
- Closely reviewing and monitoring bank accounts and credit reports for unauthorized activity for years to come; and
- Fielding an increased volume of unsolicited spam calls, texts, and other contacts attributable to the exposure of contact information in the Data Breach.

116. Moreover, Plaintiff and Class Members have an interest in ensuring that their Private Information, which is believed to remain in the possession of Defendant, is protected from further breaches by the implementation of security measures and safeguards, including but not limited to ensuring that the storage of data or documents containing personal, financial, and health information is not accessible online without appropriate protections and that access to such data is properly authenticated.

117. Further, as a result of Defendant's conduct, Plaintiff and Class Members are forced to live with the anxiety that their Private Information — which contains the most intimate details about a person's life — may be disclosed to the entire world, thereby subjecting them to embarrassment and depriving them of any right to privacy whatsoever.

118. Defendant's delay in identifying, reporting, and providing full notice of the Data Breach caused additional harm. In a data breach, time is of the essence to reduce the imminent

misuse of PII and PHI. Early notification helps a victim of a Data Breach mitigate their injuries; conversely, delayed notification causes more harm and increases the risk of identity theft. This delay violates HIPAA and other notification requirements and increases the injuries to Plaintiff and the Class.

## CLASS ACTION ALLEGATIONS

119. Plaintiff brings this action on behalf of himself and on behalf of all other persons similarly situated.

120. Plaintiff proposes the following Class definition, subject to amendment as appropriate:

> All persons whose Private Information was compromised as a result of the Data Breach experienced by Clinical Registry Solutions in or about May 2026 (the "Class").

121. Excluded from the Class are Defendant's officers and directors, and any entity in which Defendant has a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendant. Also excluded from the Class are members of the judiciary to whom this case is assigned, their families, and members of their staff.

122. Plaintiff hereby reserves the right to amend or modify the class definitions with greater specificity or division after having had an opportunity to conduct discovery. The proposed Class meets the criteria for certification.

123. **Numerosity.** The Members of the Class are so numerous that joinder of all of them is impracticable. The exact number of Class Members is unknown to Plaintiff at this time, but the number of Class Members is believed to be in the thousands.

124. **Commonality.** There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

- Whether Defendant unlawfully used, maintained, lost, or disclosed Plaintiff's and Class Members' Private Information;
- Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;
- Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;
- Whether Defendant's data security systems prior to and during the Data Breach were consistent with industry standards;
- Whether Defendant owed a duty to Class Members to safeguard their Private Information;
- Whether Defendant breached its duty to Class Members to safeguard their Private Information;
- Whether computer hackers obtained Class Members' Private Information in the Data Breach;
- Whether Defendant knew or should have known that its data security systems and monitoring processes were deficient;
- Whether Plaintiff and Class Members suffered legally cognizable damages as a result of Defendant's misconduct;

- Whether Defendant failed to provide notice of the Data Breach in a timely manner; and
- Whether Plaintiff and Class Members are entitled to damages, civil penalties, punitive damages, and/or injunctive relief.

125. **Typicality.** Plaintiff's claims are typical of those of other Class Members because Plaintiff's Private Information, like that of every other Class Member, was compromised in the Data Breach.

126. **Adequacy of Representation.** Plaintiff will fairly and adequately represent and protect the interests of the Members of the Class. Plaintiff's counsel is competent and experienced in litigating class actions, including data privacy litigation of this kind.

127. **Predominance.** Defendant has engaged in a common course of conduct toward Plaintiff and Class Members, in that all of Plaintiff's and Class Members' data was stored on the same computer systems and unlawfully accessed in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

128. **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for

Defendant. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

129. Defendant has acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis.

130. Particular issues are also appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

- Whether Defendant failed to timely notify the public of the Data Breach;
- Whether Defendant owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their Private Information;
- Whether Defendant's security measures to protect its data systems were reasonable in light of best practices recommended by data security experts;
- Whether Defendant's failure to institute adequate protective security measures amounted to negligence;
- Whether Defendant failed to take commercially reasonable steps to safeguard consumer Private Information;
- Whether adherence to FTC data security recommendations, and measures recommended by data security experts, would have reasonably prevented the Data Breach; and
- Whether Defendant failed to abide by its responsibilities under HIPAA.

131. Finally, all members of the proposed Class are readily ascertainable. Defendant has access to Class Members' names and addresses affected by the Data Breach. Class Members are identifiable through Defendant's own records.

## CAUSES OF ACTION

### First Count
### Negligence
### (On Behalf of Plaintiff and Class Members)

132. Plaintiff incorporates by reference each and every material fact of this Complaint as if fully set forth herein.

133. Defendant CRS required Plaintiff and Class Members (directly and/or indirectly through their healthcare providers and employers) to provide non-public personal information in order to receive clinical registry and related healthcare data services and/or employment.

134. By collecting and storing this data on CRS's computer systems, and using it for commercial gain, Defendant had a duty of care to use reasonable means to secure and safeguard its computer systems — and Class Members' Private Information held within them — to prevent disclosure of the information, and to safeguard the information from theft. Defendant's duty included a responsibility to implement processes by which it could detect a breach of its security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a Data Breach.

135. Defendant owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protected the Private Information.

136. Defendant's duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendant CRS and patients and employees, which is recognized by laws and regulations, including but not limited to HIPAA, as well as common law. Defendant was in a position to ensure that its systems were sufficient to protect against the foreseeable risk of harm to Class Members from a Data Breach.

137. Defendant's duty to use reasonable security measures under HIPAA required Defendant to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(1). Some or all of the medical information at issue in this case constitutes "protected health information" within the meaning of HIPAA.

138. In addition, Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

139. Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential Private Information.

140. Defendant breached its duties, and thus was negligent, by failing to use reasonable measures to protect Class Members' Private Information. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

- Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;

- Failing to adequately monitor the security of its networks and systems;
- Failure to periodically ensure that its email and remote-access systems had plans in place to maintain reasonable data security safeguards;
- Allowing unauthorized access to Class Members' Private Information;
- Failing to detect in a timely manner that Class Members' Private Information had been compromised; and
- Failing to timely notify Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

141. It was foreseeable that Defendant's failure to use reasonable measures to protect Class Members' Private Information would result in injury to Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the healthcare industry.

142. It was therefore foreseeable that the failure to adequately safeguard Class Members' Private Information would result in one or more types of injuries to Class Members.

143. Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

144. Defendant's negligent conduct is ongoing, in that it still holds the Private Information of Plaintiff and Class Members in an unsafe and unsecure manner.

145. Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

**Second Count**
**Negligence Per Se**

**(On Behalf of Plaintiff and All Class Members)**

146. Plaintiff incorporates by reference each and every material fact of this Complaint as if fully set forth herein.

147. Pursuant to the Federal Trade Commission Act, 15 U.S.C. § 45, Defendant had a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' Private Information.

148. Pursuant to HIPAA, 42 U.S.C. § 1320d, *et seq*., Defendant had a duty to implement reasonable safeguards to protect Plaintiff's and Class Members' Private Information.

149. Pursuant to HIPAA, Defendant had a duty to render the electronic PHI it maintained unusable, unreadable, or indecipherable to unauthorized individuals, as specified in the HIPAA Security Rule by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without use of a confidential process or key." *See* definition of encryption at 45 C.F.R. § 164.304.

150. Defendant breached its duties to Plaintiff and Class Members under the Federal Trade Commission Act and HIPAA by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' Private Information.

151. Defendant's failure to comply with applicable laws and regulations constitutes negligence *per se*.

152. But for Defendant's wrongful and negligent breach of its duties owed to Plaintiff and Class Members, Plaintiff and Class Members would not have been injured.

153. The injury and harm suffered by Plaintiff and Class Members were the reasonably foreseeable result of Defendant's breach of its duties. Defendant knew or should have known that

it failed to meet its duties, and that Defendant's breach would cause Plaintiff and Class Members to experience the foreseeable harms associated with the exposure of their Private Information.

154. As a direct and proximate result of Defendant's negligent conduct, Plaintiff and Class Members have suffered injury and are entitled to compensatory, consequential, and punitive damages in an amount to be proven at trial.

**Third Count**
**Breach of Implied Contract**
**(On Behalf of Plaintiff and Class Members)**

155. Plaintiff incorporates by reference each and every material fact of this Complaint as if fully set forth herein.

156. When Plaintiff and Class Members provided their Private Information to Defendant CRS (directly or indirectly through their healthcare providers or employers) in exchange for Defendant's clinical registry abstraction, data management, employment, or related services, they entered into implied contracts with Defendant pursuant to which Defendant agreed to reasonably protect such information.

157. Defendant solicited, offered, and invited Class Members to provide their Private Information as part of Defendant's regular business practices. Plaintiff and Class Members accepted Defendant's offers and provided their Private Information to Defendant.

158. In entering into such implied contracts, Plaintiff and Class Members reasonably believed and expected that Defendant's data security practices complied with relevant laws and regulations, including HIPAA, and were consistent with industry standards.

159. Plaintiff and Class Members paid money (directly or indirectly) to Defendant with the reasonable belief and expectation that Defendant would use part of its earnings to obtain adequate data security. Defendant failed to do so.

160. Plaintiff and Class Members would not have entrusted their Private Information to Defendant in the absence of the implied contract between them and Defendant to keep their information reasonably secure.

161. Plaintiff and Class Members would not have entrusted their Private Information to Defendant in the absence of its implied promise to monitor its computer systems and networks to ensure that it adopted reasonable data security measures.

162. Plaintiff and Class Members fully and adequately performed their obligations under the implied contracts with Defendant.

163. Defendant breached its implied contracts with Class Members by failing to safeguard and protect their Private Information.

164. As a direct and proximate result of Defendant's breach of the implied contracts, Class Members sustained damages as alleged herein, including the loss of the benefit of the bargain.

165. Plaintiff and Class Members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach.

166. Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to, *e.g.*, (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate long-term credit monitoring to all Class Members.

**Fourth Count**
**Breach of Fiduciary Duty**
**(On Behalf of Plaintiff and Class Members)**

167. Plaintiff incorporates by reference each and every material fact of this Complaint as if fully set forth herein.

168. In light of the special relationship between Defendant CRS and Plaintiff and Class Members, whereby Defendant became guardian of Plaintiff's and Class Members' Private Information, Defendant became a fiduciary by its undertaking and guardianship of the Private Information, to act primarily for Plaintiff and Class Members (1) for the safeguarding of Plaintiff's and Class Members' Private Information; (2) to timely notify Plaintiff and Class Members of a Data Breach and disclosure; and (3) to maintain complete and accurate records of what information (and where) Defendant did and does store.

169. Defendant has a fiduciary duty to act for the benefit of Plaintiff and Class Members upon matters within the scope of its relationship with the patients and employees whose data it maintains, to keep secure their Private Information.

170. Defendant breached its fiduciary duties to Plaintiff and Class Members by failing to diligently discover, investigate, and give detailed notice of the Data Breach to Plaintiff and the Class in a reasonable and practicable period of time.

171. Defendant breached its fiduciary duties to Plaintiff and Class Members by failing to encrypt and otherwise protect the integrity of the systems containing Plaintiff's and Class Members' Private Information.

172. Defendant breached its fiduciary duties owed to Plaintiff and Class Members by failing to timely notify and/or warn Plaintiff and Class Members of the Data Breach.

173. Defendant breached its fiduciary duties to Plaintiff and Class Members by otherwise failing to safeguard Plaintiff's and Class Members' Private Information.

174. As a direct and proximate result of Defendant's breaches of its fiduciary duties, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the compromise, publication, and/or theft of their Private Information;

(iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of their Private Information; (iv) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their Private Information, which remains in Defendant's possession; (vi) future costs in terms of time, effort, and money that will be expended as a result of the Data Breach; and (vii) the diminished value of Defendant's services they received.

175. As a direct and proximate result of Defendant's breach of its fiduciary duties, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm, and other economic and non-economic losses.

**Fifth Count**
**Unjust Enrichment**
**(On Behalf of Plaintiff and Class Members)**

176. Plaintiff incorporates by reference each and every material fact of this Complaint as if fully set forth herein.

177. Plaintiff brings this claim individually and on behalf of all Class Members. This count is pled in the alternative to the breach of contract count above.

178. Upon information and belief, Defendant funds its data security measures entirely from its general revenue, including payments made by or on behalf of Plaintiff and the Class Members.

179. As such, a portion of the payments made by or on behalf of Plaintiff and the Class Members is to be used to provide a reasonable level of data security, and the amount of the portion of each payment made that is allocated to data security is known to Defendant.

180. Plaintiff and Class Members conferred a monetary benefit on Defendant. Specifically, they (or their healthcare providers or employers acting on their behalf) purchased goods and services from Defendant and/or its agents and in so doing provided Defendant with their Private Information. In exchange, Plaintiff and Class Members should have received from Defendant the goods and services that were the subject of the transaction and have their Private Information protected with adequate data security.

181. Defendant knew that Plaintiff and Class Members conferred a benefit which Defendant accepted. Defendant profited from these transactions and used the Private Information of Plaintiff and Class Members for business purposes.

182. In particular, Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiff's and Class Members' Private Information. Instead of providing a reasonable level of security that would have prevented the hacking incident, Defendant instead calculated to increase its own profits at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the requisite security.

*183.* Upon information and belief, Plaintiff and Class Members entrusted their personal and medical information to Defendant for healthcare treatment, expecting that this information would be safeguarded in accordance with federal law. Because Defendant and its clinicians accept Medicare and exceed the statutory low-volume thresholds, Defendant is required by the Centers for Medicare and Medicaid Services Promoting Interoperability program to use certified electronic health records for all patients and to maintain those records consistent with federal security and privacy standards. See 42 C.F.R. § 414.1305 *et seq*.

184. Upon information and belief, Defendant derives substantial financial and operational benefits by participating in the Promoting Interoperability program, including avoidance of Medicare payment penalties and access to a broader patient base. The ability to leverage comprehensive patient information through its certified EHR system enables Defendant to coordinate care more efficiently, improve performance on quality measures, and optimize participation in advanced payment models, resulting in increased revenue and a stronger competitive position.

185. Equity does not permit Defendant to retain these substantial benefits, including full Medicare reimbursement and the efficiencies and strategic advantages gained from certified EHR systems, while failing to implement and maintain the security and privacy measures that are required conditions of such participation, thereby unjustly enriching itself at the expense of Plaintiff and Class Members.

186. Under the principles of equity and good conscience, Defendant should not be permitted to retain the money belonging to Plaintiff and Class Members, because Defendant failed to implement appropriate data management and security measures that are mandated by industry standards.

187. Defendant failed to secure Plaintiff's and Class Members' Private Information and, therefore, did not provide full compensation for the benefit Plaintiff and Class Members provided.

188. Defendant acquired the Private Information through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

189. If Plaintiff and Class Members knew that Defendant had not reasonably secured their Private Information, they would not have agreed to provide their Private Information to Defendant.

190. Plaintiff and Class Members have no adequate remedy at law.

191. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (a) actual identity theft; (b) the loss of the opportunity of how their Private Information is used; (c) the compromise, publication, and/or theft of their Private Information; (d) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft; (e) lost opportunity costs associated with efforts expended and the loss of productivity addressing and attempting to mitigate the consequences of the Data Breach; (f) the continued risk to their Private Information; and (g) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach.

192. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

193. Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that it unjustly received from them. In the alternative, Defendant should be compelled to refund the amounts that Plaintiff and Class Members overpaid for Defendant's services.

**Sixth Count**
**Declaratory Judgment**
**(On Behalf of Plaintiff and Class Members)**

194. Plaintiff incorporates by reference each and every material fact of this Complaint as if fully set forth herein.

195. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Complaint.

196. An actual controversy has arisen in the wake of Defendant's Data Breach regarding its present and prospective common law and other duties to reasonably safeguard the Private Information of patients and employees and whether Defendant is currently maintaining data security measures adequate to protect Plaintiff and Class Members from further data breaches that compromise their Private Information.

197. Plaintiff alleges that Defendant's data security measures remain inadequate. Plaintiff will continue to suffer injury because of the compromise of his Private Information and remains at imminent risk that further compromises of his Private Information will occur in the future.

198. Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

- Defendant continues to owe a legal duty to secure patients' and employees' Private Information and to timely notify them of a data breach under the common law, state law, HIPAA, Section 5 of the FTC Act, and various states' statutes; and
- Defendant continues to breach this legal duty by failing to employ reasonable measures to secure such Private Information.

199. The Court also should issue corresponding prospective injunctive relief requiring Defendant to employ adequate security protocols consistent with law and industry standards to protect such Private Information.

200. If an injunction is not issued, Plaintiff and Class Members will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach at Defendant. The risk of another such breach is real, immediate, and substantial. If another breach at Defendant occurs, Plaintiff and Class Members will not have an adequate remedy at law because many of the

resulting injuries are not readily quantified, and they will be forced to bring multiple lawsuits to rectify the same conduct.

201. The hardship to Plaintiff and Class Members if an injunction does not issue exceeds the hardship to Defendant if an injunction is issued. Among other things, if another massive data breach occurs at Defendant, Plaintiff and Class Members will likely be subjected to fraud, identity theft, and other harms described herein. On the other hand, the cost to Defendant of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendant has pre-existing legal obligations to employ such measures.

202. Issuance of the requested injunction will not do a disservice to the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach at Defendant, thus eliminating the additional injuries that would result to Plaintiff and the thousands of individuals whose Private Information would be further compromised.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

- For an Order certifying this action as a class action and appointing Plaintiff and his counsel to represent the Class;
- For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and Class Members' Private Information, and from refusing to issue prompt, complete, and accurate disclosures to Plaintiff and Class Members;
- For equitable relief compelling Defendant to utilize appropriate methods and policies with respect to consumer data collection, storage, and safety, and to

disclose with specificity the type of Private Information compromised during the Data Breach;

- For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendant's wrongful conduct;
- Ordering Defendant to pay for not less than ten years of credit monitoring services for Plaintiff and the Class;
- For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;
- For an award of attorneys' fees and costs, and any other expense, including expert witness fees;
- Pre- and post-judgment interest on any amounts awarded; and
- Such other and further relief as this Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury on all claims so triable.

Dated: May 18, 2026

Respectfully submitted,

*/s/ Gary E. Mason*

Gary E. Mason
**MASON & PERRY LLP**
5335 Wisconsin Avenue NW, Suite 640
Washington, DC 20015
Tel: (202) 429-2290
Email: gmason@masonllp.com

*Attorney for Plaintiff*